```
 1                IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF COLORADO

 3      Criminal Action No. 20-cr-00198-CMA-4

 4

 5      UNITED STATES OF AMERICA,

 6           Plaintiff,

 7           vs.

 8      JEROME GUARDIOLA,

 9           Defendant.

10      ----------------------------------------------------------

11                      REPORTER'S TRANSCRIPT
                    Change of Plea and Sentencing
12      ----------------------------------------------------------

13
        Proceedings before the HONORABLE CHRISTINE M. ARGUELLO, Judge,
14      United States District Court for the District of Colorado,
        commencing at 9:02 a.m. on the 24th day of October, 2023, in
15      Courtroom A602, United States Courthouse, Denver, Colorado.

16                             APPEARANCES

17      For the Plaintiff:
        BRIAN M. DUNN, ESQ.
18      U.S. Attorney's Office
        1801 California Street, Suite 1600
19      Denver, CO 80202

20      For the Defendant:
        LISA A. POLANSKY, ESQ.
21      Polansky Law Firm, PLLC
        4999 Pearl East Circle, Suite 201
22      Boulder, CO 80301

23

24

25
```

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | (Counsel and defendant were present, and the following |
| 3 | proceedings were had:) |
| 4 | THE COURT:  All right.  Good morning.  The Court |
| 5 | calls Criminal Case Number 20-cr-00198-CMA-4 entitled United |
| 6 | States of America versus Jerome Guardiola. |
| 7 | Counsel, would you please enter your appearances. |
| 8 | MR. DUNN:  Good morning, Your Honor.  Brian Dunn on |
| 9 | behalf of the United States. |
| 10 | THE COURT:  Good morning. |
| 11 | MS. POLANSKY:  Good morning, Your Honor.  Lisa |
| 12 | Polansky on behalf of Mr. Jerome Guardiola, who's seated to my |
| 13 | right on bond. |
| 14 | THE COURT:  Good morning. |
| 15 | All right.  For the record, the Court also notes |
| 16 | that Officer Mallory Coleman, representing the United States |
| 17 | Probation Office, is also attending this hearing.  Good |
| 18 | morning. |
| 19 | OFFICER COLEMAN:  Good morning, Your Honor. |
| 20 | THE COURT:  All right.  The Court previously granted |
| 21 | the Government and defendant's joint motion to allow this |
| 22 | defendant to withdraw his guilty plea as to Count 3 of the |
| 23 | superseding indictment.  It's my understanding, Ms. Polansky, |
| 24 | that your client wishes to enter a plea of guilty to Count 1 of |
| 25 | an information which charges a violation of 18 United States |

1    Code Section 1201(d) and 2, attempted kidnapping and aiding and

2    abetting the same; is that correct?

3              MS. POLANSKY:  Correct, Your Honor.

4              THE COURT:  All right.  Would you and Mr. Guardiola

5    please approach the podium.

6              MS. POLANSKY:  Yes, Your Honor.

7              THE COURT:  Ms. Abiakam, would you please administer

8    the oath to Mr. Guardiola.

9         (The defendant was duly sworn.)

10             THE COURT:  All right.  Mr. Guardiola, have you read

11   and do you understand this new charge against you in the

12   information?

13             THE DEFENDANT:  Yes, Your Honor.

14             THE COURT:  Do you also understand that you have a

15   constitutional right to be charged by an indictment by the

16   grand jury, but you can waive that right and consent to be

17   charged in an information?

18             THE DEFENDANT:  Yes, Your Honor.

19             THE COURT:  Now, an information differs from an

20   indictment in that it is the U.S. Attorney that prepares the

21   information, and it is a grand jury that enters the indictment.

22   A grand jury is composed of at least 16 and not more than 23

23   people.  And in order to indict you, at least 12 grand jurors

24   must find that there is probable cause to believe that you

25   committed this crime.  And a grand jury might or it might not

1    indict you.

2              In order for me to proceed today with this

3    information rather than an indictment, you must waive your

4    right to be indicted by the grand jury.  And if you do that,

5    then this case will proceed against you based on the

6    information just as if you had been indicted.  So have you

7    discussed these rights with your attorney?

8              THE DEFENDANT:  Yes, Your Honor.

9              THE COURT:  Have any threats or promises been made

10   to induce you to waive your right to indictment?

11             THE DEFENDANT:  No, Your Honor.

12             THE COURT:  And do you wish to waive your right to

13   indictment by a grand jury and proceed on this information?

14             THE DEFENDANT:  Yes, Your Honor.

15             THE COURT:  All right.  Ms. Polansky, Mr. Dunn, is

16   there any reason that he should not waive his right to an

17   indictment?

18             MR. DUNN:  No, Your Honor.

19             MS. POLANSKY:  No, Your Honor.

20             THE COURT:  All right.  I note that I have on the

21   record before me the Court Exhibit 1, which is the plea

22   agreement; Court Exhibit 2, which is the statement of the

23   defendant in advance of plea of guilty; Court Exhibit 3, which

24   is the information; and Court Exhibit 4, which is the original

25   waiver of indictment, which has been signed by the defendant

1   and his attorney, and I have now also signed it.

2          All right.  Mr. Guardiola, do you understand that

3   you just took an oath to tell me the truth, and if you answer

4   any of my questions falsely here today, that could be the basis

5   for a separate prosecution against you for perjury or making a

6   false statement?

7          THE DEFENDANT:  Yes, Your Honor.

8          THE COURT:  Do you also understand that you have the

9   right to remain silent and you do not have to answer any of my

10  questions here today?

11         THE DEFENDANT:  Yes, Your Honor.

12         THE COURT:  However, before I can accept your plea

13  of guilty, I need to be sure that you understand the charge

14  that is brought against you, that you understand your choices

15  and the consequences to those choices.  I also need to make

16  sure that your decision to plead guilty is voluntary and that

17  you've not been pressured into that decision and that there's a

18  factual basis to support your plea of guilty.

19         So for purposes of this hearing -- therefore, I'm

20  going to have to ask you these questions, and I will need you

21  to answer those questions.  So for purposes of this hearing, do

22  you give up your right to remain silent in order to answer the

23  questions I need to ask you?

24         THE DEFENDANT:  Yes, Your Honor.

25         THE COURT:  All right.  Ms. Polansky, do you concur

1    in the defendant's waiver of his right to remain silent for

2    purposes of this hearing?

3              MS. POLANSKY:  Yes, Your Honor.

4              THE COURT:  All right.  Mr. Guardiola, I want to

5    make sure you understand that although you have signed your

6    plea agreement, you are not yet bound by any plea of guilty.

7    And you will not be bound until I accept your plea of guilty,

8    so you can change your mind at any point during this hearing up

9    until the time that I accept your plea of guilty.

10             Now, if at any time I ask you something or I tell

11   you something and you do not understand what I'm asking or

12   telling you, I need you to let me know that you do not

13   understand so I can clarify for you.  Okay?

14             THE DEFENDANT:  Yes, Your Honor.

15             THE COURT:  And if at any time you want to stop and

16   speak privately with your lawyer, that is perfectly fine.  Just

17   let me know, and I will allow you to do that.  All right?

18             THE DEFENDANT:  Yes, Your Honor.

19             THE COURT:  What is your true and correct full name?

20             THE DEFENDANT:  Jerome Jacob Guardiola.

21             THE COURT:  How old are you?

22             THE DEFENDANT:  Thirty-nine.

23             THE COURT:  What level of school did you complete?

24             THE DEFENDANT:  High school.

25             THE COURT:  Do you have any problems reading or

1    writing in English?

2                THE DEFENDANT:  No.

3                THE COURT:  Are you now under the influence of any

4    drug, narcotic, marijuana, or alcohol?

5                THE DEFENDANT:  No.

6                THE COURT:  Are you under the influence of any type

7    of medicine?

8                THE DEFENDANT:  No.

9                THE COURT:  Is there anything at all about how you

10   feel right now, either physically or emotionally, that prevents

11   you from understanding what is happening in this hearing?

12               THE DEFENDANT:  No.

13               THE COURT:  Ms. Polansky, do you have any reason to

14   believe that Mr. Guardiola should not go forward with this

15   hearing today?

16               MS. POLANSKY:  I do not, Your Honor.

17               THE COURT:  Do you believe he is in possession of

18   his faculties and competent to proceed?

19               MS. POLANSKY:  Yes, I do.

20               THE COURT:  Biased on the statements of the

21   defendant and his attorney and my observations, I find that the

22   defendant is in full possession of his faculties and is

23   competent to proceed.

24               So, Mr. Guardiola, have you had enough time to

25   discuss this new charge in the information with your attorney?

```
1                    THE DEFENDANT:  Yes, Your Honor.

2                    THE COURT:  And do you understand what you are

3       charged with?

4                    THE DEFENDANT:  Yes, Your Honor.

5                    THE COURT:  Ms. Polansky, would you outline for the

6       Court your understanding of the terms of the plea agreement?

7                    MS. POLANSKY:  Yes, Your Honor.  Mr. Guardiola will

8       be pleading to this new count, attempt kidnap, aiding and

9       abetting.  The Government agrees to recommend a variant

10      sentence of 24 months BOP and dismiss the counts and, really,

11      the entirety of the superseding indictment, recommend three

12      levels for reduction for acceptance of responsibility.  We

13      would be, in turn, providing a limited appellate waiver, as

14      well as a limited waiver of collateral attack.

15                   And essentially we have one other agreement that

16      pertains to the -- kind of the maximum of the restitution

17      order, no greater than 18,000.

18                   THE COURT:  Correct.

19                   Mr. Dunn, do you agree with that description of the

20      plea agreement?

21                   MR. DUNN:  I do, Your Honor.

22                   THE COURT:  Mr. Guardiola, do you agree with that

23      description of the plea agreement?

24                   THE DEFENDANT:  Yes, Your Honor.

25                   THE COURT:  Have you had enough time to discuss the
```

1    plea agreement with Ms. Polansky?

2                THE DEFENDANT:  I have.

3                THE COURT:  Has she answered all of your questions

4    to your satisfaction?

5                THE DEFENDANT:  Yes, Your Honor.

6                THE COURT:  All right.  For purposes of a factual

7    basis, may the Court rely on the factual basis as set forth in

8    the plea agreement on page -- I believe it was 6?

9                MS. POLANSKY:  Yes, Your Honor, on behalf of

10   Mr. Guardiola.

11               MR. DUNN:  Yes --

12               THE COURT:  All right.

13               MR. DUNN:  -- Your Honor.

14               THE COURT:  I'm sorry, Mr. Dunn.  I interrupted you.

15               MR. DUNN:  Yes, Your Honor.

16               THE COURT:  All right.  So, Mr. Guardiola, would you

17   turn to page 6 of the -- of Exhibit 1.  On these pages is a

18   statement of the facts that the Government believes it could

19   prove if this matter went to trial.  By entering into this plea

20   agreement, you are admitting these facts.  And I will treat

21   them as true, both for purposes of considering your plea of

22   guilty and for purposes of determining what sentence I should

23   impose.  Now, have you had enough time to review that statement

24   of fact?

25               THE DEFENDANT:  Yes, Your Honor.

1            THE COURT:  Would you like to take any additional

2    time right now to further review that statement of fact?

3            THE DEFENDANT:  No, thank you.

4            THE COURT:  Do you agree that the facts that are

5    stated on page 6 of Exhibit 1 are true?

6            THE DEFENDANT:  Yes, Your Honor.

7            THE COURT:  Is there any inaccuracy in those facts

8    that you would like to correct at this time?

9            THE DEFENDANT:  No, Your Honor.

10            THE COURT:  Are you pleading guilty because you did

11    the things charged in the information?

12            THE DEFENDANT:  Yes.

13            THE COURT:  Are you pleading guilty because you are

14    guilty?

15            THE DEFENDANT:  Yes.

16            THE COURT:  All right.  I need you to tell me in

17    your own words what it is you did that you're pleading guilty

18    to.

19            THE DEFENDANT:  I stood guard at the tattoo shop.

20            THE COURT:  All right.  And you were involved in the

21    communications leading up to that kidnapping?

22            THE DEFENDANT:  Involved in the communication prior

23    to it.

24            THE COURT:  All right.  Mr. Dunn, is the Government

25    satisfied with the factual basis as supplemented by the plea

1    agreement?

2              MR. DUNN:  Yes, Your Honor.

3              THE COURT:  All right.  Mr. Guardiola, can you now

4    turn to the signature pages of Exhibits 1 and 2 and tell me if

5    that is your signature.

6              THE DEFENDANT:  Yes, Your Honor.

7              THE COURT:  When you signed Exhibits 1 and 2, did

8    you do that voluntarily?

9              THE DEFENDANT:  Yes, Your Honor.

10             THE COURT:  Was Ms. Polansky present with you when

11   you signed them?

12             THE DEFENDANT:  Yes, Your Honor.

13             THE COURT:  Did she answer all of your questions

14   about your plea to your satisfaction before you signed them?

15             THE DEFENDANT:  She did.

16             THE COURT:  Ms. Polansky, do Exhibits 1 and 2 bear

17   your signature?

18             MS. POLANSKY:  They do, Your Honor.

19             THE COURT:  Did you review Exhibits 1 and 2 with

20   your client?

21             MS. POLANSKY:  Yes.

22             THE COURT:  Did you answer all of his questions?

23             MS. POLANSKY:  Yes.

24             THE COURT:  Do you believe he understands the

25   contents of Exhibits 1 and 2?

```
1              MS. POLANSKY:  I do, Your Honor.

2              THE COURT:  Mr. Dunn, does Exhibit 1 bear your

3    signature?

4              MR. DUNN:  It does, Your Honor.

5              THE COURT:  All right.  At this time, Mr. Guardiola,

6    I need to make sure you understand your legal rights, and I'm

7    going to go through those with you.  You have the following

8    constitutional rights that you'll be giving up if you plead

9    guilty:

10             You have the right to plead not guilty to any

11   offenses charged against you.  Because you've already entered a

12   plea of not guilty to the offenses in the superseding

13   indictment, you have the right to maintain that plea of not

14   guilty.

15             You have the right to a speedy and public trial.

16   You have the right to a trial by a jury of 12 persons whose

17   verdict must be unanimous.  At trial, you would be presumed

18   innocent, and the Government would have to prove your guilt by

19   proving each element of each offense against you beyond a

20   reasonable doubt.

21             If both you and the Government give up your right to

22   a jury trial, you have the right to be tried by the Court.

23   That means by me as the judge.  You have the right to have

24   competent and effective assistance of a lawyer to represent you

25   throughout this criminal proceeding, even if you do not enter a
```

plea of guilty.  If you cannot afford a lawyer, one would be appointed to represent you free of charge, and that lawyer would assist you at trial and at every other stage of these criminal proceedings.

At trial, you would have the right, with the assistance of your lawyer, to confront and cross-examine the witnesses and to challenge all evidence presented against you. At trial, you would also have the right to have witnesses subpoenaed and made to come into court to testify on your behalf.  If you could not afford to pay for those subpoenas, I would order that they be issued and served without any charge to you.

At trial, you would have the right to testify yourself on your own behalf, but you also have the privilege against self-incrimination.  That means that you have the right not to testify or make any statement that would incriminate you in any way.  If you went to trial and you decided not to testify, I would at your request tell the jury that it could not use your decision not to testify against you in any way. By pleading guilty, you are giving up that right and you are incriminating yourself.

If you went to trial and you were convicted, you would have a right to appeal your conviction.  And even though you are pleading guilty, you would have the right to appeal the sentence that I impose.

1              Have you discussed all these rights with

2    Ms. Polansky?

3              THE DEFENDANT:  Yes, Your Honor.

4              THE COURT:  Do you understand all of these rights?

5              THE DEFENDANT:  Yes, Your Honor.

6              THE COURT:  Do you understand that by entering into

7    this plea agreement, you are giving up your right to appeal or

8    otherwise challenge your prosecution, conviction, and sentence

9    under the circumstances that are outlined in the plea

10   agreement?

11             THE DEFENDANT:  Yes, Your Honor.

12             THE COURT:  And do you understand that if I accept

13   your plea of guilty, you will be incriminating yourself and you

14   will be -- you will have given up, now and forever, your right

15   to a jury trial and most of the rights I just described to you?

16             THE DEFENDANT:  Yes, Your Honor.

17             THE COURT:  Do you need any more time to talk to

18   Ms. Polansky about these rights or your waiver of these rights?

19             THE DEFENDANT:  No, Your Honor.

20             THE COURT:  Do you give up these rights?

21             THE DEFENDANT:  Yes, Your Honor.

22             THE COURT:  Ms. Polansky, are you satisfied that

23   each of these waivers by your client is knowingly, voluntarily,

24   and intelligently made?

25             MS. POLANSKY:  I am, Your Honor.

1              THE COURT:  Do you concur in each of the waivers?

2              MS. POLANSKY:  I do.

3              THE COURT:  All right.  Mr. Dunn, would you please

4      inform Mr. Guardiola about the charges to which he will be

5      pleading guilty, and state the elements of that charge.

6              MR. DUNN:  Yes, Your Honor.

7              Mr. Guardiola, you'll be pleading guilty to Title

8      18 -- violation of Title 18 United States Code Section 1201(d)

9      and Section 2, attempted kidnapping and aiding and abetting the

10     same.

11             In order to prove attempt, the Government must prove

12     the following beyond a reasonable doubt at trial:  First, you,

13     the defendant, intended to commit the crime of kidnapping; and,

14     second, you, the defendant, took a substantial step towards

15     commission of the crime of kidnapping.

16             The elements of kidnapping are as follows:  First,

17     you, the defendant, knowingly acted contrary to law and

18     kidnapped the person described in the indictment by seizing,

19     confining, or inveigling him; second, you, the defendant,

20     kidnapped the person for some purpose or benefit; third, you,

21     the defendant, willfully transported the person kidnapped; and,

22     fourth, the transportation was in interstate commerce or used

23     the mail or any means, facility, or instrumentality of

24     interstate commerce in committing or in furtherance of the

25     offense.

1          The elements of aiding and abetting, in violation of

2     Title 18 United States Code Section 2, are as follows:  First,

3     every element of the crime charged of attempted kidnapping as

4     outlined previously was committed by someone other than you,

5     the defendant; and, second, you, the defendant, intentionally

6     associated himself in some way with the crime and intentionally

7     participated in it as you would something you wished to bring

8     about.

9          THE COURT:  So, Mr. Guardiola, do you understand

10    that if this matter went to trial, the Government would have to

11    prove each of those elements against you beyond a reasonable

12    doubt?

13         THE DEFENDANT:  Yes, Your Honor.

14         THE COURT:  All right.  Mr. Dunn, could you also

15    state the maximum mandatory penalties for the charge, including

16    special assessment, supervised release, and restitution?

17         MR. DUNN:  Yes, Your Honor.  The maximum statutory

18    penalty for violation of Title 18 United States Code Section

19    1201(d) and 2 as charged in the information before you is not

20    more than 20 years imprisonment, not less than $30,000 and not

21    more than $300,000 fine, or both such fine and imprisonment,

22    not less than one year and not more than three years supervised

23    release, and a $100 special assessment fee.

24         THE COURT:  Mr. Guardiola, do you understand the

25    consequences to you of entering this plea of guilty, including

1    the maximum sentence that I could impose?

2              THE DEFENDANT:  Yes, Your Honor.

3              THE COURT:  Ms. Polansky, have you reviewed with and

4    explained to Mr. Guardiola the sentencing confrontation

5    provisions that are contained in the plea agreement?

6              MS. POLANSKY:  I have, Your Honor.

7              THE COURT:  Have you told him anything different

8    than what is set forth in that section of the plea agreement?

9              MS. POLANSKY:  I have not.

10             THE COURT:  What is the estimated range you believe

11   will apply under the advisory sentencing guidelines?

12             MS. POLANSKY:  135 to 168 months.

13             THE COURT:  All right.  Mr. Guardiola, that's based

14   on an Offense Level 31 and a Criminal History Category III.

15   What you need to understand is that I am obligated by law to

16   impose a sentence that is sufficient but not greater than

17   necessary to promote respect for the law, provide a just

18   punishment, adequately defer criminal conduct, protect the

19   public from further crime, and provide you with any needed

20   educational or vocational training, medical care, or other

21   correctional treatment in the most effective manner.

22             And to fashion a sentence that meets all those

23   objectives, I will be considering the nature and circumstances

24   of this offense, your history and characteristics, the types of

25   sentences that are available to me, what the guidelines would

1    recommend to me, the need to avoid unwarranted sentencing

2    disparity, and the need for restitution.

3                  Do you understand these factors and elements?

4                  THE DEFENDANT:  Yes, Your Honor.

5                  THE COURT:  Has Ms. Polansky explained to you that

6    the federal sentencing guidelines are merely advisory to me?

7                  THE DEFENDANT:  Yes, Your Honor.

8                  THE COURT:  Do you understand that that means, then,

9    that the sentence I impose is entirely 100 percent up to me as

10   the judge?

11                 THE DEFENDANT:  Yes, Your Honor.

12                 THE COURT:  That means I don't have to accept any

13   sentence recommended by the plea agreement, by the Government,

14   or by your lawyer.

15                 THE DEFENDANT:  Yes, Your Honor.

16                 THE COURT:  Do you understand that?  It also means,

17   though, that I can impose a sentence that's more severe or I

18   can impose one that is less severe than that recommended by the

19   guidelines, as long as I justify why I am doing so.  Do you

20   understand that?

21                 THE DEFENDANT:  I do, yes, Your Honor.

22                 THE COURT:  Do you understand that even if you are

23   disappointed with the sentence that I impose, that will not be

24   a basis for you to withdraw your plea of guilty?

25                 THE DEFENDANT:  Yes, Your Honor.

1             THE COURT:  Do you know what supervised release is?

2             THE DEFENDANT:  Yes, Your Honor.

3             THE COURT:  All right.  So you understand that if

4      you were sent to prison, when you are released from prison,

5      there will be conditions attached to that release.  Some of the

6      standard conditions are that you cannot possess -- I'm sorry,

7      you cannot commit any new crimes, you cannot possess or use

8      illegal substances, and you cannot possess any illegal

9      firearms?

10             THE DEFENDANT:  Yes, Your Honor.

11             THE COURT:  And do you understand that if you

12      violate any of the conditions of supervised release that I

13      impose, that could be the basis for me to revoke your

14      supervised release, and I could send you back to prison just

15      for the violation?

16             THE DEFENDANT:  Yes, Your Honor.

17             THE COURT:  Do you understand that this -- you're

18      pleading guilty to a felony offense?

19             THE DEFENDANT:  Yes, Your Honor.

20             THE COURT:  Do you understand that conviction of a

21      felony offense could deprive you of valuable civil rights, such

22      as the right to vote, right to hold public office, the right to

23      serve on a jury, and the right to possess a firearm of any

24      kind?

25             THE DEFENDANT:  Yes, Your Honor.

 1          THE COURT:  Do you understand that in the federal
 2   criminal system parole has been abolished, and if you are sent
 3   to prison, you will not be released early on parole?
 4          THE DEFENDANT:  Yes, Your Honor.
 5          THE COURT:  Has anyone, including your attorney,
 6   made any promises, representations, or guarantees of any kind
 7   to you about the specific sentence I would impose in order to
 8   persuade you to plead guilty?
 9          THE DEFENDANT:  No, Your Honor.
10          THE COURT:  Has anyone forced you to plead guilty?
11          THE DEFENDANT:  No, Your Honor.
12          THE COURT:  Has anyone attempted in any way to
13   threaten you, your family, or anyone close to you in order to
14   force you to plead guilty?
15          THE DEFENDANT:  No, Your Honor.
16          THE COURT:  Ms. Polansky, did you review the facts
17   of this case and all the discovery provided by the Government?
18          MS. POLANSKY:  I did, Your Honor.
19          THE COURT:  Did you review those facts and that
20   discovery with Mr. Guardiola?
21          MS. POLANSKY:  Yes, I did.
22          THE COURT:  Have you advised him concerning the
23   legality or admissibility of any statements, confessions, or
24   other evidence the Government has against him?
25          MS. POLANSKY:  I have, Your Honor.

1          THE COURT:  To the best of your knowledge, is he

2    pleading guilty because of any illegally obtained evidence in

3    the possession of the Government?

4          MS. POLANSKY:  No, Your Honor.

5          THE COURT:  Did you and he agree it was in his best

6    interest to enter this plea of guilty?

7          MS. POLANSKY:  Yes.

8          THE COURT:  Is it your opinion that he's entering

9    this plea freely and voluntarily, with full knowledge of the

10   charge and the consequences of his plea?

11         MS. POLANSKY:  Yes, Your Honor.

12         THE COURT:  Other than as set forth in the plea

13   agreement, have there been any promises, representations, or

14   guarantees made either to you or to Mr. Guardiola?

15         MS. POLANSKY:  No, Your Honor.

16         THE COURT:  Have you given any indication to

17   Mr. Guardiola of the specific sentence I would impose?

18         MS. POLANSKY:  No, Your Honor.

19         THE COURT:  Do you know of any reason why I should

20   not accept his plea of guilty?

21         MS. POLANSKY:  No.

22         THE COURT:  Do you concur in the waiver of jury

23   trial and in the plea?

24         MS. POLANSKY:  Yes, I do, Your Honor.

25         THE COURT:  Mr. Dunn, other than as set forth in the

```
 1    plea agreement, has the Government made any promises,

 2    representations, or guarantees either to Mr. Guardiola or his

 3    attorney?

 4              MR. DUNN:  No, Your Honor.

 5              THE COURT:  Does the Government consent to the

 6    defendant's waiver of jury trial, conditioned upon this matter

 7    being resolved in accordance with this plea agreement?

 8              MR. DUNN:  Yes, Your Honor.

 9              THE COURT:  Mr. Guardiola, are you satisfied with

10    the representation that Ms. Polansky has provided to you?

11              THE DEFENDANT:  Yes, Your Honor.

12              THE COURT:  Have you told her everything you know

13    about your case?

14              THE DEFENDANT:  Yes, Your Honor.

15              THE COURT:  Do you believe she has fully considered

16    any defenses you might have to the charges?

17              THE DEFENDANT:  Yes, Your Honor.

18              THE COURT:  Have you had enough time to discuss your

19    case with her?

20              THE DEFENDANT:  Yes, Your Honor, I have.

21              THE COURT:  Did she or anyone else tell you how you

22    have to answer my questions in this hearing today?

23              THE DEFENDANT:  No, Your Honor.

24              THE COURT:  Have you understood everything that I've

25    told you and everything that I've asked of you here today?
```

1              THE DEFENDANT:  Yes, Your Honor.

2              THE COURT:  Do you believe you understand the

3    consequences to you of entering this plea of guilty?

4              THE DEFENDANT:  Yes, Your Honor.

5              THE COURT:  Do you believe you are competent to make

6    the decision to plead guilty?

7              THE DEFENDANT:  Yes, Your Honor.

8              THE COURT:  Do you know of any reason why I should

9    not accept your plea of guilty?

10             THE DEFENDANT:  No, Your Honor.

11             THE COURT:  Do you understand that all that will be

12   left in your case, in the event that I do accept your plea of

13   guilty, is the imposition of sentence, which could include

14   imprisonment?

15             THE DEFENDANT:  Yes, Your Honor.

16             THE COURT:  All right.  Having in mind, then,

17   everything that we've discussed up to this point regarding your

18   plea of guilty, the rights that you are giving up, and the

19   maximum sentence I could impose, do you still wish to plead

20   guilty?

21             THE DEFENDANT:  Yes, Your Honor.

22             THE COURT:  Ms. Polansky, any reason not to accept

23   the plea agreement?

24             MS. POLANSKY:  No, Your Honor.

25             THE COURT:  Any -- Mr. Dunn, any reason not to

1    accept the plea agreement?

2              MR. DUNN:  No, Your Honor.

3              THE COURT:  Okay.  The Court accepts and approves

4    the plea agreement.

5              Other than arraigning Mr. Guardiola, do counsel

6    agree that the Court has complied with the requirements of Rule

7    11?

8              MR. DUNN:  I do, Your Honor.

9              MS. POLANSKY:  Yes, Your Honor.

10             THE COURT:  Mr. Dunn, would you please arraign

11   Mr. Guardiola.

12             MR. DUNN:  Certainly.

13             Are you the Jerome Guardiola listed in the

14   information before you?

15             THE DEFENDANT:  Yes.

16             MR. DUNN:  And how do you plead to Count 1 of that

17   information alleging a violation of Title 18 United States Code

18   Section 1201 -- Title 18 United States Code Section 1201(d) and

19   2, attempted kidnapping and aiding and abetting the same?

20             THE DEFENDANT:  Guilty.

21             THE COURT:  All right.  So, Mr. Guardiola, at this

22   time, I need to make certain findings for the Court's record.

23   If you do not understand what I'm saying or you merely want to

24   speak with Ms. Polansky, just ask her to interrupt me.  Okay?

25             THE DEFENDANT:  Yes, ma'am.

1                    THE COURT:   In the matter of Criminal Case Number

2       20-cr-00198-CMA-04 encaptioned the United States of America

3       versus Jerome Guardiola, the Court, having questioned the

4       defendant and his attorney on the offer of his plea of guilty

5       to Count 1 of an information charging violation of 18 United

6       States Code Section 1201(d) and Section 2, a felony; the

7       defendant and his attorney having advised the Court that they

8       have conferred regarding this offered plea of guilty and all

9       aspects of the charges against the defendant and any defenses

10      he might have; the Court, having observed the defendant's

11      intelligence, demeanor, and attitude while answering the

12      questions in this hearing today; and the Court, having observed

13      that he does not appear to be under the influence of any

14      medicine, drug, or other substance or factor that might affect

15      his actions or judgment in any manner, the Court finds as

16      follows:

17                    The defendant is fully competent and capable of

18      entering an informed plea, and he's aware of the nature of the

19      charges and the consequences of his plea.

20                    He has discussed his plea agreement with his

21      attorney.   He has been represented throughout this case and in

22      this hearing by competent and effective counsel with whom he

23      has no objection, criticism, or complaint.

24                    He has read and understands the terms of his plea

25      agreement.   He has signed both the plea agreement and statement

1    by the defendant.

2          He has voluntarily, knowingly, and intelligently

3    entered a plea of guilty to the offense; and he has a full

4    understanding of the nature, circumstances, factual basis, and

5    essential elements of that charge.

6          His plea of guilty is not the result of mistake,

7    misunderstanding, fear, coercion, or undue influence.  His plea

8    of guilty is not the result of any promises or representations

9    made to him by anyone, including his own attorney, except as

10   those matters discussed in the hearing or included in his plea

11   agreement.

12         He understands his legal rights in this case,

13   including his right to a trial by jury, his right to be

14   represented during all stages of these criminal proceedings by

15   an attorney, including his right to represent -- to

16   court-appointed counsel if indigent.

17         He understands the maximum sentence of imprisonment,

18   the maximum fine, the special assessment, the terms of

19   supervised release, and restitution that this Court may impose.

20         He also understands that this Court is not bound by

21   any sentence recommended in the plea agreement, and he further

22   understands that he will not be able to withdraw his plea of

23   guilty, even if the Court does not follow the recommendation.

24         He understands the essential elements of the offense

25   to which he has pled guilty, and his plea is supported by an

1    independent factual basis containing each of the essential

2    elements of the offense.

3         It is, therefore, ordered that Court Exhibits 1 and

4    2 are accepted and admitted.  The plea as made in open court

5    today is accepted, and the defendant is adjudged guilty of

6    violation of 18 United States Code Section 1201(d) and Section

7    2, attempted kidnapping and aiding and abetting the same.

8         It's my understanding that you wish to proceed to

9    immediate sentencing.  Is that correct, Ms. Polansky?

10        MS. POLANSKY:  Yes, Your Honor.

11        THE COURT:  I have received and reviewed the full

12   presentence investigation report dated September 13, 2023, as

13   revised on October 10, 2023, including all addenda thereto.

14   I've also reviewed Document Number 423, the defendant's

15   objections to the presentence report, including the joint

16   objection filed by other codefendants and this defendant.

17        I've reviewed Document 434, the Government's motion

18   for a three-level decrease in offense level for acceptance of

19   responsibility; 451, defendant's motion for a variant sentence

20   of time served -- and that included the numerous character

21   letters from his mother, partner, brother, uncle, stepdaughter,

22   physical therapist, and friends -- and also medical records.

23        In the future, Ms. Polansky, those are to be filed

24   with the probation office, not as attachments to your

25   letters -- or to your motion.

1              I've also reviewed Document Number 478, the

2      Government's response to indicate to that -- to the motion for

3      variant sentence in which the Government requests a variant

4      sentence of 247 months; and Document Number 441, the

5      Government's motion to dismiss counts, which will need to be

6      amended to dismiss the indictment.

7              Are there any documents that I failed to identify

8      that I should have reviewed in preparation for this hearing?

9              MR. DUNN:  No, Your Honor.

10             MS. POLANSKY:  No, Your Honor.

11             THE COURT:  Ms. Polansky, have you had enough time

12     to review the presentence report with Mr. Guardiola?

13             MS. POLANSKY:  I have, Your Honor.

14             THE COURT:  Did you explain the contents of that

15     report to him?

16             MS. POLANSKY:  I have.

17             THE COURT:  Do you have any concerns about his

18     ability to understand the content of that report?

19             MS. POLANSKY:  No, Your Honor.

20             THE COURT:  Mr. Guardiola, did you review the

21     presentence report?

22             THE DEFENDANT:  Yes, Your Honor.

23             THE COURT:  Did Ms. Polansky explain its contents to

24     you?

25             THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  And you understand the contents of the

2     report?

3          THE DEFENDANT:  Yes, Your Honor.

4          THE COURT:  All right.  Ms. Polansky, you submitted

5     Document Number 423, defendant's objections to the presentence

6     report as well as the joint objection.  We'll discuss those in

7     a few minutes, but are there any additional objections you

8     would like to make at this time?

9          MS. POLANSKY:  No, Your Honor.

10          THE COURT:  Mr. Dunn, does the Government wish to

11     make any objections at this time?

12          MR. DUNN:  No, Your Honor.

13          THE COURT:  All right.  The Court has reviewed the

14     objections in full and is thus aware -- is thus aware of the

15     defendant's objections to and the disagreements with the facts

16     set forth in the presentence report.  The probation officer has

17     revised the presentence report to add some of the clarifying

18     information.  The remaining matters I have considered, but they

19     do not affect the guideline calculation, nor will they affect

20     the sentence that this Court imposes.  Therefore, I did not

21     intend to address them any further.

22          Ms. Polansky, do you wish me to address them any

23     further?

24          MS. POLANSKY:  No, Your Honor.  I understand.

25          THE COURT:  All right.  The Government has filed a

1    motion pursuant to United States Sentencing Guideline Section

2    3E1.1(d) requesting that this Court grant the defendant a full

3    three-level decrease in offense level for acceptance of

4    responsibility.  That motion, Document Number 434, is granted.

5            At this time, I understand that the victim is here.

6    Does the victim wish to speak?

7            MR. O'BRYAN:  I don't have --

8            THE COURT:  I'm sorry?

9            MR. O'BRYAN:  I don't have a statement for this

10   gentleman --

11           THE COURT:  Okay.  Okay.  Very well.

12           All right.  The crime in this case was the forcible

13   kidnapping and beating of a person and the forcible covering of

14   his Hells Angels tattoos with black ink.  Because of the nature

15   of the crime, the defendant's advisory guideline range is high.

16   The total offense level in this case is 31.  The defendant's

17   criminal history category is a III.  That results in an

18   advisory guideline range of 135 to 168 months of imprisonment,

19   three years of supervised release, and a fine in the range of

20   30,000 to $250,000.

21           As part of my protocol for determining whether this

22   range is a range that is sufficient but not greater than

23   necessary to achieve the objectives of sentencing, I have

24   reviewed the presentence report and I've considered the

25   sentencing guidelines and the factors set forth at 18 United

1    States Code Section 3553.

2           The defendant has filed a motion for a downward --

3    or for a variant sentence of time served, which would be three

4    days.  And the Government has responded, indicating that it

5    believes a sentence of 24 months incarceration is appropriate.

6           I'm going to start with the defendant's argument

7    that the fifth -- that the 3553(a) factor that provides the

8    need to avoid unwarranted sentencing disparities among

9    defendants with similar records who have been found guilty of

10   similar conduct merits a probationary sentence in this case.

11          In support of that argument, the defendant

12   references the probation sentences received by two codefendants

13   who were charged in state court and who received probationary

14   sentences.  One of those was the president of the Hells Angels

15   Denver chapter.  But my review of the documents in this case

16   indicates that while he did participate in some of the other

17   activities, he was not present at all on July 12th.  The other

18   member, I'm not sure what his participation was.

19          The defendant cites no legal authority to support

20   this argument that the Court needs to consider those

21   probationary sentences as part of the 3553(a) factors in this

22   case.  The Tenth Circuit, however, has held that 18 United

23   States Code Section 3553(a)(6) authorizes consideration of

24   disparate sentences among and between federal defendants, but

25   it does not require the Court to consider sentences received by

1  similarly situated state court defendants.  That's *U.S. v.*
2  *Branson*, 463 F.3d 1110, Tenth Circuit 2006, and *U.S. v.*
3  *Wiseman*, W-I-S-E-M-A-N, 749 F.3d 1191, Tenth Circuit 2014.  The
4  Court will not consider the state court sentences with respect
5  to the -- that factor of 3553.
6      The defendant is before this Court for sentencing on
7  his fourth felony and second federal conviction.  He is a
8  member of the Hells Angels Denver chapter, and specifically the
9  vice president of the local chapter and the West Coast
10  representative.  Apparently, he and other members of the Hells
11  Angels Denver chapter voted to remove the victim from the gang
12  due to what they collectively considered to be undesirable
13  behavior, including his default -- the victim's default on a
14  bond that had been arranged by members of the Hells Angels
15  Denver chapter.
16      The defendant and other members of the Hells Angels
17  Denver chapter decided that the victim not only needed to be
18  removed from the group, but that he needed to be beaten and all
19  of his Hells Angels clothing and items taken away, including
20  the removal or blacking out of his Hells Angels tattoo.
21      Now, although the June 28th assault was not charged
22  in the indictment, it is important to provide context for the
23  July 12th assault and the defendant's role in that assault.  On
24  June 28th, 2019, several codefendants, including the defendant,
25  contacted the victim at a house in Erie, Colorado, where they

1    assaulted and injured him.  They stole his wallet, his phone,

2    and $2,000 cash.  The victim was lucky and managed to escape

3    into a nearby field.

4             Between June 28th, 2019, and July 12th, 2019, it

5    appears that the victim was doing his best to stay away from

6    and hide from the defendant.  The defendant and his

7    codefendants, on the other hand, were tenaciously working hard

8    to find the victim by driving by places they knew he might

9    frequent, visiting homes and employment of old girlfriends,

10   even going so far as to round up delivery uniforms to make

11   false deliveries to get their foot in the door of former

12   girlfriends.  They tried tracing his burner phone.  They kept

13   an eye on pawnshops where the victim might pawn tools.  And all

14   of this is described in the group conversation in WhatsApp.

15            On July 12th, 2019, the defendant and other Hells

16   Angels Denver chapter members found out from another

17   codefendant, who was not a member of the group but is an

18   associate, that the victim was present at this associate's

19   residence.  On July 12th, 2019, the codefendants communicated

20   with the intention of descending on that residence to beat the

21   defendant and take him to codefendant's tattoo parlor.

22            And what happened was as the victim entered the

23   garage of that residence, several of the co-conspirators

24   grabbed him, they beat him, they zip-tied him, they transported

25   him in the back of a truck against his will to the tattoo

1    parlor.   The victim reported that he was in and out of

2    consciousness and restrained to a chair in the tattoo parlor.

3    Members who were present included this defendant, who

4    apparently was taking pictures while the tattoos were being

5    removed.   The codefendants then called a bounty hunter to

6    retrieve the victim from the tattoo parlor.

7              Defendant argues that he did not directly

8    participate in the kidnapping or assault of the victim, but he

9    admits that he facilitated the crime by informing the others as

10   to the victim's whereabouts, and he was present at the tattoo

11   shop once the victim was there.

12             Defendant's contributions to the group conversations

13   in the WhatsApp on July 12th were as follows:

14             9:32 a.m., July 2nd -- actually, this is July 2nd.

15   Me and Jared -- referring to his codefendant, Jared Orland --

16   got only good leads last night if any of you want to get a

17   beer.

18             July 2nd at 3:37 p.m., he responds, in response to a

19   codefendant's inquiry as to whether anyone knew where Mary, a

20   former girlfriend, lived -- former girlfriend of the victim

21   lived, this defendant said, quote, I know where she works, end

22   quote.

23             On July 12th, then, at 5:33 p.m., this defendant

24   said, quote, We are -- we out here meeting Callie (phonetic),

25   end quote.

1          He then warned the group, at 5:44, that there was
2     about to be a ton of cops in the neighborhood because a dude
3     just got -- dude on a bike got hit by a car.
4          I'm not sure what this one referred to, but at
5     5:49 p.m., he said, You're too close.
6          At 6:24 p.m. that afternoon, he responded to a text
7     that the girl they thought the victim was hiding with drove a
8     white Escalade.  He responded, White Suburban, and then sent a
9     picture of a white Suburban with a license plate number.
10          At 7:35 p.m., he responded in the WhatsApp, They're
11     bringing him -- referring to the victim -- to Dusty's, which
12     was the tattoo parlor.
13          In response to an inquiry from Dusty as to what door
14     to meet him at, he said, quote, Front, Dusty, at 7:51 p.m.,
15     essentially saying, Meet me at the front door of your tattoo
16     parlor.
17          He wasn't there at the time, apparently, because at
18     8:08 he says, quote, On the way.  Or he might have been there,
19     but he was responding to a codefendant who said he needed a
20     ride from Jerome's shop, and he says on his way.  So he might
21     have been there at the time and then left to go pick someone
22     up.  So he was fairly involved, even if he didn't participate
23     in the actual beating.
24          He had been -- has been on pretrial release for four
25     years.  There have been some compliance issues, but he has

1    remained out of custody since the inception of the case.

2            His employment history consists of his own custom

3    auto body shop or working with close friends in a similar type

4    of work.  He indicates that if he is sentenced to an extended

5    period in prison, he will undoubtedly lose his business, his

6    employees will lose their jobs, he will likely lose his home,

7    because his spouse will not be able to carry the mortgage on

8    her own, and she, too, will lose her home.  And all I can say

9    is, like most defendants, unfortunately, that's the

10   consequences of committing a crime.

11           The Government refers to the assault on the victim

12   as being an, quote, out bad ritual, end quote, of the Hells

13   Angels Club and indicates that this out bad ritual was

14   committed for the purpose of protecting the Hells Angels Club

15   symbol and to reinforce their club rules.  Defendant objects to

16   the statement that the outing process would involve physical

17   assault, threats, or other violence as being factually

18   inaccurate and indicates there has been no violence towards

19   other out bad members of the Hells Angels Denver Club other

20   than this case.

21           This case was bad enough.  It was violent.  It was

22   premeditated.  And despite denials that it was a gang endeavor

23   which appears to have been committed to complete a gang ritual,

24   that's exactly what it is.  Even if it wasn't a Hells Angels

25   ritual, it was your ritual.  So whether or not it was a ritual

1    does not lessen the criminality of the conduct.

2           It was an aggravated assault involving the beating

3    of the defendant (sic), his kidnapping, and another assault

4    involving the forcible removal of his Hells Angels tattoos.  As

5    a result, the victim suffered serious bodily injury.  He was in

6    the hospital for months with broken bones, concussion, and his

7    mental health has been negatively affected by the assault and

8    his injury.

9           That type of gang behavior is totally unacceptable.

10   It is conduct that the Court might expect of a gang of children

11   whose frontal lobes have not been fully developed.  And *Lord of*

12   *the Flies* comes to mind.  I don't know if any of you have read

13   that, but if you haven't, I suggest you read it.

14          It's a book about a group of boys in their early

15   teens who are stranded on an uninhabited island and then the

16   disastrous attempts that they have to try to govern themselves.

17   And it shows tension between gang or group think and

18   individuality, emotional reaction, rational and not rational

19   emotional reaction, morality, and immorality.

20          And the central concern is the conflict that -- two

21   competing impulses that exist within all of us, and that is the

22   instinct to live by rules and act peacefully and follow a moral

23   code and the value -- well, and the instinct to gratify one's

24   immediate desires and to act violently to obtain supremacy.

25   And that's what you all were doing.  You were acting violently

```
1    to obtain supremacy over your victim.  And while one could see
2    how children might resort to this type of conduct, this is not
3    the conduct that society expects from fully grown men.
4            So to me, it really doesn't matter whether or not
5    this is a formal ritual of the Hells Angels Club when they
6    expel someone from their group.  The fact is that the conduct
7    that you and your codefendants exhibited in this case is a
8    prime example of how and why gang or mob mentality is so
9    dangerous to society.
10           The Government requests a variant sentence of 24
11   months, which is a greater than 80 percent variance from the
12   low end of the guideline range.  Based on my review of the case
13   and after consideration of the 3553(a) factors, I am inclined
14   to find that a variant sentence is warranted, because I think
15   135 months is too high.  But a variant sentence of three days
16   time served is not supported by the 3553(a) factors.  I'm
17   inclined to deny the defendant's motion.  I am inclined to
18   impose a variant sentence of 24 months of imprisonment, 3 years
19   of supervised release with the special conditions recommended
20   by the probation office, restitution, and a $10,000 fine.
21           That being said, Ms. Polansky, I'll let you attempt
22   to persuade me otherwise.  And I'll hear from the Government,
23   and then, finally, Mr. Guardiola, I will hear from you.  And I
24   will tell you, your statement to me is going to make a big
25   difference in what I do.
```

1                THE DEFENDANT:  Yes, ma'am.

2                MS. POLANSKY:  Thank you, Your Honor.

3           My involvement in this case began in August '22, so

4      just over a year involvement, unlike some of my colleagues, who

5      have been on this case, actually, since it was in the state

6      court, for four years.

7           And I recall when I first saw the case, I mean, I

8      frankly asked the Government if they'd be fine with an ends of

9      justice, because I saw the voluminous discovery.  And as I went

10     through it, thinking it's quite daunting -- you know, numerous

11     devices seized and downloaded and numerous locations, basically

12     search warrants were executed and all these devices were seized

13     and so forth.  And, ultimately, it appeared for the most part

14     it really didn't turn up much.

15          But this -- this incident, the June/July incident

16     involving Mr. O'Bryan, is clearly the centerpiece of the case

17     and, you know, to all of us, concerning in its violent nature.

18     But it definitely put it in perspective for us when we went to

19     the Government to talk about how we might resolve the case,

20     because Mr. Guardiola from the outset was in that mind-set.

21     Even though there was a delay, it was mostly my fault.  So one

22     of the things that factored into my negotiations with the

23     Government I think was just kind of that context, that it was

24     at first this huge, overwhelming beast of a case, and then it

25     really kind of boiled down to this unfortunate incident.

1          And the other issue really paramount for us is that

2     although, yes, my client has a criminal record, as the Court

3     pointed out -- and one of them being a federal prior -- taking

4     that into account and when speaking with the Government, it was

5     really important and we agreed, essentially, that

6     Mr. Guardiola's involvement was quite limited.

7          He wasn't involved in the June incident with

8     Mr. O'Bryan.  In fact, during that time period -- and I'll back

9     up a little bit.  He'd actually voted against Mr. O'Bryan being

10    even in the club.  And part of it was because of his history

11    with Mr. O'Bryan was, overall, very friendly and positive, and

12    he considered him a friend.

13         And he felt like -- Mr. O'Bryan had kind of let him

14    and his family stay with him, and they exchanged the favor and

15    Mr. O'Bryan lived with my client and his wife for years.  And

16    because of that long-standing relationship, my client didn't

17    feel that he really had enough responsibility to -- to hold up

18    the values that were positive in the club, so he voted no.  He

19    didn't really want him involved at all.  But then, ultimately,

20    he did get in.

21         And when this whole incident came up where he --

22    where Mr. O'Bryan wasn't following through with some of his

23    obligations with regard to bond and so forth, Mr. Guardiola was

24    one of the ones who kept calling him.  And you can kind of see

25    it.  He's -- they're trying to track him down.  Some of it I

1    think for some people was nefarious with nefarious intent, and

2    my client's intent essentially was to bring him in and say,

3    Just give everything back.  That's how we do it.  Let us put an

4    out date on your tattoo and you're done.  That was never,

5    obviously, accomplished.

6         Of course, Mr. Guardiola continued to communicate,

7    as the Court pointed out, as to where he was, facilitated his

8    location, him being located, and ultimately, of course, stood

9    by while he was -- had his tattoos blacked out.  But I think

10   it's important, when the Court is considering the other

11   defendants in the case, you know, he didn't tattoo him, he

12   didn't beat him, he didn't restrain him, none of that.

13        And Mr. Guardiola will tell you himself he -- his

14   heart hurts over this whole situation.  And I think when he

15   came out of prison thinking, Okay, I did my time, I completed

16   supervised release, the business is back up, we're good, you

17   know, at that point, he'd only ultimately, at the time of this

18   case, been in the club for five years, unlike some people who

19   had been in for decades.  Although he had this vice president

20   role, he didn't have a lot of juice, really.  The time in the

21   club carries a little bit more juice.

22        That said, Mr. Guardiola built up his business that

23   he has now where he does have several employees.  And when --

24   when I look at where he is now and when I talked to him about

25   how we deal with this case, he continued to say, you know, I

1    want to take responsibility.  So here we are.  We had him plead

2    guilty to the aiding and abetting.  And this, to me, is kind of

3    a more true aiding and abetting-type role.

4            The thing, too, that I thought was important is, you

5    know, while the recommendation of the Government for

6    Mr. Ullerich and Mr. Guardiola was kind of similar, 24, 27

7    months, I think it's important to -- to keep that in

8    perspective, because as we know, Mr. Ullerich really has no

9    record but was very directly involved in this incident, whereas

10   my client has the criminal record but really limited

11   involvement.  So I think that's why those -- based on my

12   conversations with the Government, that's why they came up with

13   these kind of very similar recommendations.

14           The reason why I asked for supervised release and

15   time served and went a little bit further than that is because

16   of my client and who he is, because that wasn't really

17   necessarily factored into the negotiations.  Mr. Guardiola is

18   an individual and, as you can see, you know, as he stands

19   before you, is physically, you know, a little bit intimidating.

20           I remember when I first met him, I was like, Whoa,

21   you know, okay.  And, you know, he's got the tattoos, and he's

22   a big guy and a little ominous.  And for me, it was very

23   quickly that I learned that he is really a very gentle and kind

24   soul at heart.  And as I talked to some of his family members

25   and read the letters and got to know him a little bit more, I

1   realized that's exactly what's going on here.  He -- as he's

2   grown up -- and it's taken some time, frankly.  As he's grown

3   up, he has realized some of these mistakes that he's made and

4   tried to clean it up.

5            In fact, he had that -- that case, that Jefferson

6   County case, where it started out as a civil dispute between

7   him and a customer at the shop, and it became a criminal thing;

8   it became messy.  And he was paying thousands and thousands of

9   dollars to make it right, and it just wasn't fast enough. And

10   ultimately, the court, albeit illegally, extended the probation

11   sentence.

12            But Mr. Guardiola was never in violation of that

13   probation.  He just continued to pay regardless.  And we kind

14   of -- kind of put an end to that, so to speak, and said, you

15   know, All right, that's enough; it's past its legal extension.

16   But, again, it's Mr. Guardiola being responsible and following

17   through with trying to pay that off, no matter how long it

18   took.

19            And I think it's important to note that, you know,

20   as many tattoos as Mr. Guardiola has, one of the things you can

21   see even in the PSI photo is this big tattoo across his chest

22   that says, Family first.  And I would suggest to the Court and

23   after, you know, seeing the courtroom quite full today, that

24   kind of sums up Jerome.  That really kind of sums him up.

25            He had a prior marriage.  He's been with Megan

1    Wamsley for 11, 12 years now.  As she put in his -- in her

2    letter to the Court -- you know, I think it's profound -- is

3    that she considers him her best friend and her -- and her safe

4    place.  And his stepson, Riley, has come to call him dad and

5    really begun to find him as a role model and all the positive

6    things that he stands for.

7              And I recall talking to Mr. Guardiola about the club

8    and -- and why he kind of went there after prison.  And what he

9    learned was, at first, it started out being kind of structured,

10   a brotherhood that was positive, and there were a lot of

11   positive things.  And then he found himself in this situation,

12   where he stands before this Court extremely remorseful, not

13   only that this happened to someone he calls a friend, but that

14   he also is, as the Court mentioned, inflicting these

15   consequences on his loved ones and his employees and the people

16   that he truly cares about.

17             The thing that I also wanted to point out was that,

18   you know, as he has developed as a human being, as a man, he

19   has kind of gone on a little bit more of a spiritual seeking.

20   And, you know, Mary Hughes' letter spoke to that a little bit,

21   about her being a spiritual confidant.  She was hoping to be

22   here today, Your Honor.  She just adopted, I think, another

23   grandson.  And that kind of echoes that family -- the extended

24   family that Mr. Guardiola values so much.

25             But she wrote in her letter how she's been kind of a

1    guide for him to help him find, you know, the way to stay on

2    the path.  And he's been able to do that in so many ways.  It's

3    exemplified in his business dealings.  The Court has several

4    letters from business associates that he has, some employees,

5    family, friends.

6         And so for us, the reason that we kind of went kind

7    of one step further and said, yes, we understand -- and I hear

8    the Court saying, you know, 24 months seems appropriate.

9    And -- and I appreciate that, and we appreciate that.  And I

10   thought it was important to just say Mr. Guardiola's been out

11   for four years.  And there's certainly been some confusion

12   about financial documents that were supposed to be provided.

13   He had all his documents, unfortunately, seized in 2019 when

14   his business was searched and his residence.  So it took some

15   restructuring and compiling to get documents back together.

16        But past that, he's been in complete compliance and

17   has continued, even knowing this day is coming, to try to make

18   sure his wife is taken care of, his son is taken care of, his

19   other family's taken care of, the employees are taken care of,

20   who's going to run the shop.

21        And you can see, in Riley's letter in particular --

22   and he's here.  He's the young man here in the front.  You

23   know, in Riley's letter in particular, the Court can see that,

24   you know, some of the things that struck me, beyond the fact

25   that now Riley's going to try to hold it down, is that he says,

```
 1    The best part is how happy my mom is with this man.  He treats
 2    and respects my mom with more love than I've seen a man treat a
 3    woman.  There's never a single moment I doubted his love for
 4    me.  He made sure I graduated high school, holding me
 5    accountable, responsible.  I am the man I am today because of
 6    Jerome, and I'm grateful to call him dad.  I could probably
 7    write a book explaining my love and respect for Jerome, but I
 8    don't have time to do that.  Jerome is the best man I know and
 9    the person I look up to the most, and there's nothing in my
10    life I would change that I've been through with him.  He's my
11    best friend and the best father, and I'm lucky to have him.
12          And as this Court's well aware, you know, it's this
13    Court's job to look at all these factors in 3553.  But at the
14    end of the day, it's not a formula.  It's really this Court
15    considering the specific circumstances of the event and the
16    specific circumstances of the client.  And I'm asking the Court
17    to consider our recommendation of the time served and
18    supervised release.  And with that, I know that my client
19    wanted to address the Court.
20          THE COURT:  All right.  I'll first hear from the
21    Government, and then I'll hear from --
22          MS. POLANSKY:  Oh, yes.  Thank you, Your Honor.
23    Thank you.
24          THE COURT:  Mr. Dunn, do you wish to take the
25    podium?
```

1              MR. DUNN:  Thank you, Your Honor.

2              Your Honor, the recommendation of the Government is

3    an attempt to balance.  Again, using Section 2A2.2, the

4    aggravated assault guidelines, as guidance.  First, the good.

5    The defendant has been -- if not with financial documents,

6    which I think the Government was a little less concerned with,

7    he has been compliant for many years on probation.  He has --

8    he does have a reduced role as compared to other defendants.

9    To be fair to the defendant, there's no evidence that he was in

10   Erie, Colorado, on June 28th.  In fact, I don't believe he was

11   there.

12             And then, finally, Your Honor, he has two prior

13   felony convictions.  There's a third that was a deferred

14   judgment in state court that was completed and dismissed, so we

15   do consider him to have two priors.

16             Your Honor, now, the -- as the Court pointed out, at

17   about 5 p.m. it is clear that Mr. Guardiola was near

18   Mr. Beste's residence.  He was giving -- even before July 12th

19   he was obviously coordinating how to find Mr. O'Bryan, how to

20   essentially help the Hells Angels hunt Mr. O'Bryan down.  He

21   obviously had full knowledge of the attack.  He was the vice

22   president of the organization and the West Coast

23   representative.  He had full knowledge of the Erie attack.  He

24   understood the purpose of hunting down the victim.

25             He knew that the victim was going to be assaulted.

1    He knew that the victim was going to be kidnapped on that day

2    and taken to the tattoo parlor.  And he certainly knew why the

3    location where the victim would eventually be taken was a

4    tattoo parlor, and that was to complete what the Government has

5    called the out bad ritual.  It was to cover up his tattoos by

6    force.

7          There's a difference between standing by as

8    someone's attacked and standing guard.  Mr. Guardiola was

9    coordinating with Mr. Ullerich to come out front to facilitate

10   the kidnapping of the victim, and he clearly, at a minimum,

11   stood guard as the victim was being attacked.  So for that

12   reason, Your Honor, I think this recommended sentence is --

13   certainly, we believe a custodial sentence is appropriate,

14   given the violence of the crime and given that the violence was

15   done on behalf of a gang to reinforce gang rules.

16         Your Honor, I don't know if we'll hear more today,

17   and certainly this is meaning no disrespect whatsoever to the

18   defense attorney.  She did an excellent job.  But what I hear

19   over and over, and one of the reasons that I think that the

20   Court's analogy to *Lord of the Flies* is such a good one, is

21   Mr. Guardiola -- I don't know if he's going to remain a member

22   of Hells Angels.  It does appear that he will, and he will

23   after -- I assume after incarceration.  I don't know.

24         But I think this prosecution should stand as a

25   reminder that when we hear about things like he was going to

1    vote the victim in or he was going to vote the victim out or,

2    you know, he had to abide by these club rules, it means so

3    little to people outside of this organization.  And I think

4    people within the organization need to understand they're not

5    *Lord of the Flies* on an island.  They're not creating their own

6    rules; they're not creating their own government.  And when

7    they go out into the public and create a deadly situation

8    pursuant to these club rules that nobody knows anything about,

9    they are subject to federal law; they are subject to state law.

10   They're not on an island.

11          And, Your Honor, I believe that an incarceration for

12   this kind of violent event, understanding that the defendant

13   did not -- while we have no evidence that he struck the victim,

14   he clearly facilitated this.  And I think that his criminal

15   history, which is serious, is taken into account in arriving at

16   a recommendation of 24 months.

17          Thank you.

18          THE COURT:  Thank you, Mr. Dunn.

19          All right.  Ms. Polansky, if you and Mr. Guardiola

20   will retake the podium.

21          MS. POLANSKY:  Yes, Your Honor.

22          THE COURT:  Mr. Guardiola, now's your time to

23   persuade me.

24          THE DEFENDANT:  I don't feel like persuading is

25   maybe the right word.  I just feel like being honest with the

1   whole situation.  And when Ms. Polansky said that I tried to

2   keep him -- that I did no vote him, and as the -- he said, it

3   was not to -- it was not to keep him away from me as a person

4   but more to keep him out of the things that, by the time I was

5   five years in the club, I realized was probably not the best

6   decisions.

7        And being that I was the first person who

8   encountered Josh or even, you know, brought him around

9   anything, I felt that I was responsible for a lot of everything

10  that was happening, because I was the only reason that, you

11  know, he wanted to do this, because I -- the years that we met

12  each other prior to that, he was super eager and -- and, you

13  know, he thought everything I was doing was so cool.  And not

14  to say that anything I was doing wasn't, just that I tried -- I

15  tried to just guide him.

16       And when he was -- when we were -- we were friends,

17  and you don't do stuff like that to your friends.  And that was

18  a bad situation and -- in the foresight of everything.  But

19  trying to pull him back into reality a few times was -- was my

20  job to -- you know, to keep a friend from doing something or

21  for any of this happening in the first place.  And for that,

22  I -- I am remorseful.

23       And I -- I can't say that it wouldn't have happened

24  or it would have happened, because I feel like he wanted to be

25  part of it so bad.  And -- and I was part of it with him.  And

1    we -- we put miles on.  You know, we rode motorcycles together.

2    We did all the things that guys like us do.  And when this

3    thing came down to getting bad and -- and the situation

4    happening, I reached out multiple times to try to help, help,

5    help.  And sometimes -- like my grandpa told me, you can't lead

6    a horse to water -- or you can lead a horse to water, but you

7    can't make them drink.

8           So for me, I -- I don't wish any of the long-term

9    things on Josh in any way, and I don't wish any of the things

10   that happened to him that day.  And I do wish everything would

11   have happened totally different, because it has happened.  I've

12   been there when it happened, and it doesn't go down like that.

13   And that was the first time that I had ever been involved, in

14   the five years of me being in the club, in anything like that.

15   So to me, I feel like it was a learning experience for me, and

16   here I am learning, and I have learned from the situation.

17          And this case going on for four years has really --

18   you know, really 100 percent showed me the ins and outs of what

19   this club is about and what it does for me in any sense.  You

20   know, when I first joined the club, I thought it was benefiting

21   me to have people to rely on and brothers to rely on.  And I

22   have that without the club, because I have a group of men and

23   women behind me that have absolutely nothing to do with the

24   club, and they're sitting here, unlike my club sitting here.

25          So for me, I feel like going forth after this, you

know, or even in the last four years, my mind's not going to

change on how I feel about the people that I surround myself

with, to never put myself in this situation again.  So in

regards to staying in or staying out of the club, I have to

watch my Ps and Qs in that situation, because I don't want to

put my family through anything that Josh's family's had to go

through.

So I have to be respectful, and I have to do the

right things and -- and make the right decisions.  And I will.

I will make the right decision.  I have done a lot of the right

decisions so far.  So I feel like I've let everybody down.  You

know?  Because I am supposed to be this guy who, you know,

always gives, gives, gives, and helps.  And I haven't been able

to do that as much, because the club has taken so much away

from me lately.  And my role, whether it be small or large in

Josh's situation, was wrong.  That's all there is to it.

And I don't -- I appreciate your time, Your Honor.

And I really -- for me, the letter -- and you speaking to me

last time saying that you want to hear what I have to say, my

letter took me two and a half months to write.  I think I

deleted it five times or I added on.  I'm an awful speller.  I

have awful wordplay.  I'm nothing like -- you know, like -- I

let my brother read it, and he's all, Man, you gotta clean this

up.  I just feel like this is me.  And if there's misspellings

or periods not where they go, I don't really know any better

1    than that because I don't do that every day.  I don't write

2    about myself.  I don't write in general.  We all text each

3    other every day, and that's just what society is.

4          So I've let down my son, because he's having to sit

5    in court and watch me go through this.  And that's hard,

6    because you're supposed to be this solid factor in his life.

7    And sitting in court is not a solid part of his life.  And I --

8    and I thought about it a million times about even letting him

9    come here, but he's a grown man now, and he knows what this

10   does.  So hopefully it helps him in the rest of his life make

11   decisions that better him.

12         And letting down Megan has been a huge deal to me,

13   because this whole plan this whole time that I brought people

14   into her life, Josh being one of them, I've always told her I

15   would never bring anybody into your house, our house, that I

16   don't trust or that I don't feel is worthy of sleeping in the

17   same house as us.

18         And I would never say that about Josh.  When me and

19   Josh were -- me and Josh, we were on it.  We were tight-knit.

20   We were together all the time.  We ran things together.  We

21   bossed things up, and that's what we did.  We -- he helped me

22   run my business, and -- and we were a good crew of guys

23   together.  And when things fell apart, they fell apart pretty

24   fast.  And -- and that sucks, and it's a bad situation.

25         So if I could say anything, it would be, you know,

1    I'm not going to sit here and beg to be a free man, because I

2    know what comes with that play, and I don't expect the judge to

3    go and make herself look like you're not giving me the right

4    thing.  I just want to be able to be here like I've been able

5    to, because of the courts and this whole situation taking so

6    long, for the last four years to provide for my family, my two

7    youngest kids, my ex-wife, and all the people that are friends

8    and family that I support.

9         And this isn't their fault.  And -- and like you

10   said earlier, this is the consequences of breaking the law.

11   And I can't change anything that happened right now.  I wish I

12   could, and I can't.  And I feel like all we can do is move on

13   from here, and I can -- I can take what Your Honor gives me and

14   make the best of it.

15        Thank you.

16        THE COURT:  Thank you.

17        All right.  Well, before I impose sentence, I just

18   want everybody to know -- you, Mr. Guardiola, your supporters,

19   your family, your friends -- sentencing is the hardest thing I

20   have to do.  And I have a lot of hard things on my shoulders,

21   but this is the hardest.  To look at a man like you, who, yeah,

22   you made some errors in your earlier years, but you had

23   straightened out your life, and say, you know, you committed a

24   crime that really physically and emotionally and mentally

25   injured someone else, and he was a close friend of yours --

1           THE DEFENDANT:  Yeah.  Awful.

2           THE COURT:  -- and say, Well, and for that I have to

3      send you to prison, because we can't have that kind of criminal

4      behavior going on.  And I -- I want to be fair to you, but I

5      have an obligation to society to protect them from this.

6           And I try to put myself in your shoes, which is why

7      I tell you at the change of plea I really want to hear from you

8      the honest truth, because I'm trying to understand why you

9      would do this, why you would do this to a friend,  You know?

10     You tried to keep him out of it; he got into it.

11          And you said something in your statement that you

12     have to watch your Ps and Qs because you don't want the same

13     thing to happen to your family.  And so I'm trying to

14     understand why you would have even shown up.  Is it something

15     that was mandated because you're a member?

16          THE DEFENDANT:  Oh, yeah.

17          THE COURT:  And that's -- that's what I thought, a

18     lot of -- a lot of folks just felt that if they didn't show

19     up -- I mean, there were some that didn't show up.  They were

20     out of town or whatever.  But -- but it was -- it was -- what

21     would have happened if you hadn't shown up?

22          THE DEFENDANT:  I could be in the same position.

23          THE COURT:  And that's what I was thinking.  So it's

24     the gang mentality with all the emotion going on, but it's also

25     that threat.  But you said this had never happened to anybody

1     before.

2             THE DEFENDANT:  The negative part of it.  There's

3     been plenty of people to leave our charter.  In our charter, in

4     my time being in the club, that out bad, out good, however it

5     was, never has happened like this before.

6             THE COURT:  But you can leave the club if you wish?

7             THE DEFENDANT:  Yes, ma'am.

8             THE COURT:  And nothing bad has ever happened?

9             THE DEFENDANT:  No.  There's not a -- there's not a

10    rule to do the things that happened to Josh at all.  The -- the

11    situation occurred because they -- the club wants that thing

12    that Josh has to make sure that everybody knows that he's no

13    longer a part of the club.  And if you give up that thing --

14    the tattoo, the clothes, the hats, the shirts, the anything

15    that was gifted to you -- the proper way, then you -- there's

16    no negativity about it.  You just -- you pretty much don't ever

17    talk to the club ever again.

18            THE COURT:  All right.  And that's where I'm kind of

19    at odds here, because I said, well, if that's the case that the

20    club isn't violent and you could do that, then you could leave

21    at any time.  You didn't have to show up, correct?

22            THE DEFENDANT:  I would have put myself in a bad

23    situation, I feel like, because if I -- if I hadn't have showed

24    up there, I'd have been the same thing he was doing.  I was

25    running from the situation, and --

1              THE COURT:  But you could leave if you wanted; and

2       if you voluntarily gave up everything, there would be no

3       consequence.

4              THE DEFENDANT:  Before that situation you're talking

5       about?

6              THE COURT:  Yes.

7              THE DEFENDANT:  Yeah, I could have.  And in the

8       club, I -- I should have.  I should have stopped the whole

9       situation.  And I tried to stop it with him, but I didn't stand

10      up tall enough in the room and stop the situation.

11             THE COURT:  All right.  As a result of United States

12      Supreme Court rulings in *United States v. Booker* and *United*

13      *States v. Fanfan*, the United States Sentencing Commission

14      guidelines have become advisory to this Court.  Although the

15      Court is not bound to apply those guidelines, it has consulted

16      them and taken them into account, along with the factors set

17      forth in Section 3553(a).

18             The Court determines that no finding is necessary

19      concerning the objections to the presentence report, because

20      the controverted matters have either been addressed through

21      revisions to the report or they have not been taken into

22      account in calculating the advisory guideline sentence, nor

23      will they affect the sentence that the Court imposes.

24             Neither the Government nor the defendant has

25      challenged any other aspect of the presentence report.

1    Therefore, the remaining factual statements and guideline

2    applications are adopted without objection as the Court's

3    findings of fact concerning sentencing.

4            The Court finds that the total offense level is 31;

5    the defendant's criminal history category is a III.  That

6    results in an advisory imprisonment range of 135 to 168 months,

7    a fine range of 30,000 to $250,000, and a supervised release

8    range of three years.

9            With respect to defendant's motion for a variant

10   sentence of time served, which would be three days, for the

11   reasons previously stated by the Court, the Court denies the

12   defendant's request for a nonguideline sentence of time served.

13   However, for the reasons previously stated, the Court does find

14   that a lesser variant sentence is merited.

15           Pursuant to the Sentencing Reform Act of 1984, it's

16   the judgment of the Court that the defendant, Jerome Guardiola,

17   is hereby committed to the custody of the Bureau of Prisons to

18   be imprisoned for a term of 15 months.  Upon release from

19   imprisonment, he shall be placed on supervised release for a

20   term of three years.  Within 72 hours of release from the

21   custody of the Bureau of Prisons, he shall report in person to

22   the probation office in the district to which he is released.

23           While on supervised release, he shall not commit

24   another federal, state, or local crime; shall not possess a

25   firearm, as defined in 18 United States Code Section 921; and

1    shall comply with the standard conditions that have been

2    adopted by this Court.  He shall not unlawfully possess a

3    controlled substance.  He shall refrain from any unlawful use

4    of a controlled substance.  He shall submit to one drug test

5    within 15 days of release on supervised release and the maximum

6    of 20 tests per year supervision thereafter.  He shall

7    cooperate in collection of DNA as directed by the probation

8    officer.

9         The Court finds that the following special

10   conditions of supervised release are reasonably related to the

11   factors set forth in 18 United States Code Sections 3553(a) and

12   3583(d).  Further, based on the nature and circumstances of

13   this offense and the history and characteristics of this

14   particular defendant, the following conditions do not

15   constitute a greater deprivation of liberty than reasonably

16   necessary to accomplish the goals of sentencing.

17        Given the totality of the circumstances, the Court

18   will impose the gang contact condition to control risk to the

19   community posed by the defendant, to provide the defendant with

20   an element of deterrence from committing future criminal

21   conduct, and to address officer safety concerns.  The defendant

22   must not knowingly associate with or have contact with any

23   individuals he knows to have -- to be or have reason to believe

24   are gang members, including members of the Hells Angels

25   Motorcycle Club, or the Destroyers Motorcycle Club, or any

affiliated support groups, and must not participate in gang

activity, to include the displaying of gang paraphernalia.

Second, he must participate in a program of

cognitive behavioral treatment approved by the probation

officer and follow the rules and regulations of that program.

The probation officer, in consultation with the treatment

provider, will supervise his participation in the program as to

modality, duration, and intensity.  He must pay for the cost of

treatment based on his ability to pay.

Given the totality of the circumstances, the Court

will impose a search condition to control risk to the community

posed by the defendant, to provide the defendant with an

element of deterrence from committing future criminal conduct,

and to address officer safety concerns.

The defendant shall submit his person, property,

house, residence, papers, computers, other electronic

communication or data storage devices or media, or office to a

search conducted by a United States probation officer.  Failure

to submit to search may be grounds for revocation of release.

The defendant shall warn any other occupants that the premises

may be subject to searches pursuant to this condition.

An officer may conduct a search pursuant to this

condition only when reasonable suspicion exists that the

defendant has violated a condition of his supervision and that

the areas to be searched contain evidence of the violation.

1    Any search must be conducted at a reasonable time and in a

2    reasonable manner.

3              The defendant shall make restitution in the total

4    amount of $17,890.95 to the victim indicated in the presentence

5    report.  The defendant shall not incur new credit charges, open

6    additional lines of credit, obtain or enter into any financing

7    agreement or arrangement without the approval of the probation

8    officer unless he is in compliance with the periodic payment

9    obligations imposed pursuant to the Court's judgment and

10   sentence.

11             As directed by the probation officer, he shall apply

12   any moneys received from income tax refunds, lottery winnings,

13   inheritances, judgments, and any anticipated or unexpected

14   financial gains to the outstanding court-ordered financial

15   obligation in this case.

16             He shall make payment on the restitution obligation

17   that remains unpaid at the commencement of supervised release.

18   Within 60 days of release from confinement, he shall meet with

19   the probation officer to develop a plan for the payment of

20   restitution.  He shall work with the probation officer in

21   development of a monthly budget that will be reviewed with the

22   probation officer quarterly.  He shall document all income,

23   compensation, and financial support generated or received from

24   any source and provide that information to the probation

25   officer as requested.

1           The plan of payment will be based upon his income

2     and payments.  Such monthly installment payments shall be at

3     least 10 percent of the defendant's gross monthly income

4     because his sentence imposes restitution as a condition of

5     supervision that he pay in accordance with this order.

6           If he has an outstanding financial obligation, the

7     probation office may share any financial or employment

8     documentation relevant to the defendant with the Asset Recovery

9     Division of the United States Attorney's Office to assist in

10     the collection of the obligation.

11           Restitution is ordered jointly and severally with

12     codefendants in this case:  Clinton Williams, Jared Orland,

13     Dustin Ullerich, Pete Baron, Adam Mulcahy, Derek Beste, and

14     Dominic Robichaud in 22-cr-00239.

15           He shall pay a special assessment of $100.  I'm not

16     going to impose a fine, due to your reduced role in this crime.

17     I order that the payment of the special assessment and the

18     restitution obligation shall be due immediately.  I will not

19     impose interest on the restitution.  Any unpaid restitution

20     balance upon release from incarceration shall be paid in

21     monthly installment payments that the Court has just specified

22     above.

23           This was a tough one.  I will tell you I lose sleep

24     over these things, believe it or not, because I want to be

25     fair.  And I'm not God, but in a sense I'm asked to play God,

1    because I impact your life no matter what I do.  I impact your

2    family's life no matter what I do.  I impact the victim's life,

3    to a certain extent, no matter what I do.

4           But I believe that your role in this case was not as

5    egregious as some of the others, and therefore I don't think a

6    sentence of 24 months was appropriate when you compare yourself

7    to Mr. Ullerich, who actually blacked out the tattoos, or

8    Mr. Orland, who actually grabbed him, and the other defendant

9    that actually punched him out.

10          So I do believe, however, that, you know, you knew

11   what was going to happen.  You didn't have to show up.  Maybe

12   in your mind you thought you did, but you didn't.  And the

13   consequences of showing up are 15 months of imprisonment, which

14   I think, together with the three years of supervised release

15   and the special conditions, does reflect the seriousness of

16   your role in this offense and is a sufficient but not greater

17   than necessary sentence to achieve the purposes of sentencing,

18   which are to protect the public from further crimes, to promote

19   respect for the law, and to deter you from committing

20   additional criminal -- you and others from committing

21   additional criminal conduct like this.

22          Mr. Guardiola, although you've waived your right to

23   appeal as set forth in the circumstances outlined in your plea

24   agreement, to the extent that you have not waived your right to

25   appeal and you desire to appeal, you are advised that you must

1    file a notice of appeal with the clerk of the Court within 14

2    days of entry of judgment or your right to appeal will be lost.

3            If you are not able to afford an attorney for an

4    appeal, the Court will appoint one to represent you.  And if

5    you request, the clerk of the court must immediately prepare

6    and file a notice of appeal on your behalf.

7            The Government's motion -- I'll take an amendment of

8    that to dismiss the indictment.  Mr. Dunn?

9            MR. DUNN:  Yes, Your Honor.  I will file that.

10           THE COURT:  You don't have to file it.  Just make an

11   oral motion.

12           MR. DUNN:  I would move to dismiss the indictment

13   with regard to this defendant.

14           THE COURT:  That oral motion is granted.  441 -- I

15   will consider it an amendment to 441, so I'm granting it.

16           All right.  The Court finds that the defendant's

17   bond conditions do reasonably assure that he will not flee or

18   pose a danger to the safety of any other person in the

19   community.  And as such, I will allow Mr. Guardiola to remain

20   free on bond subject to the same conditions as set forth in the

21   conditions setting -- order setting the conditions of his

22   release.

23           Mr. Guardiola, you're ordered to surrender to the

24   institution designated by the Bureau of Prisons before noon

25   within 15 days of the date of designation.  Your bond is

```
1    exonerated at the time of your voluntary surrender to that
2    institution.
3              Is there anything further to be brought to my
4    attention?
5              MR. DUNN:  No, thank you, Your Honor.
6              MS. POLANSKY:  Your Honor, two things.  Is it
7    possible to allow Mr. Guardiola 30 days from the date of
8    designation?  He's got a considerable amount still left to do
9    to make sure the business and everybody is taken care of before
10   he goes.
11             THE COURT:  All right.  I will amend my order that
12   he shall surrender before noon within 30 days of the date of
13   designation.
14             THE DEFENDANT:  Thank you, Your Honor.
15             MS. POLANSKY:  And he is asking -- and I know the
16   Court can only make a recommendation -- that he stay in
17   Colorado, for the same purpose.
18             THE COURT:  I will recommend that the Bureau of
19   Prisons attempt to designate him to an institution here in
20   Colorado for purposes of remaining close to his family and his
21   rehabilitation.
22             THE DEFENDANT:  Thank you, Your Honor.
23             MS. POLANSKY:  Thank you very much, Your Honor.
24             THE COURT:  All right.  Mr. Guardiola, I hope I
25   don't ever see you in my courtroom again.
```

```
1              THE DEFENDANT:  Thank you for taking the time to
2    read everything and do what you said you were going to do.
3              THE COURT:  All right.
4              MS. POLANSKY:  Thank you.
5              THE COURT:  All right.  Court will be in recess.
6              (The hearing was concluded at 10:22 a.m. on Tuesday,
7    October 24, 2023.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                          <u>REPORTER'S CERTIFICATE</u>

2          I, ERIN E. VALENTI, Official Court Reporter for the

3    United States District Court for the District of Colorado, a

4    Registered Merit Reporter and Certified Realtime Reporter, do

5    hereby certify that I reported by machine shorthand the

6    proceedings contained herein at the time and place

7    aforementioned and that the foregoing pages constitute a full,

8    true, and correct transcript.

9          Dated this 19th day of March, 2024.

10

11

12

13

14                              <u>    /s/ Erin E. Valenti    </u>

15                              ERIN E. VALENTI, RMR, CRR
                                  Official Court Reporter
16

17

18

19

20

21

22

23

24

25